PRESENT:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee, JJ., and Lacy, S.J.[1]


RAN NIZAN

OPINION BY

v. Record No. 061577

JUSTICE G. STEVEN AGEE
September 14, 2007

WELLS FARGO BANK MINNESOTA
NATIONAL ASSOCIATION, F/K/A
NORWEST BANK MINNESOTA NATIONAL
ASSOCIATION, TRUSTEE, ETC.

FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
James F. D'Alton, Jr., Judge

In this appeal we consider the judgment of the Circuit Court of the City of Petersburg entered against Ran Nizan and in favor of Wells Fargo Bank Minnesota National Association ("Wells Fargo").  Nizan appeals the circuit court's judgment that the funds Wells Fargo received through a settlement agreement with another entity cannot affect the amount of damages for which Nizan is liable to Wells Fargo as the result of a defaulted loan.  For the reasons set forth below, we will reverse the judgment of the circuit court.

I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Nizan and Avram Cimerring were business partners regarding certain apartment complexes through their ownership of Lee Hall, L.L.C.  To facilitate financing of the apartments, Nizan and Cimerring executed a guaranty ("the Guaranty") of an Amended and

---

[1] Justice Lacy participated in the hearing and decision of this case prior to the effective date of her retirement on

Restated Deed of Trust Note ("the Note") made payable to HSA/Wexford Bancgroup, L.L.C., as lender, from Lee Hall, L.L.C., as borrower. Four apartment complexes served as collateral under deeds of trust for the Note. Although HSA/Wexford was payee of the Note, the loan was funded by UBS PaineWebber, Inc., ("UBS"), which then acquired the Note. UBS later assigned the Loan[2] to Merrill Lynch Mortgage Investors, Inc., Real Estate Investment Mortgage Conduit[3] ("the REMIC Trust") as part of a securitized mortgage loan pool. Wells Fargo serves as trustee for the REMIC Trust, and its participation in this case is in that capacity.

After the Note went into default, Wells Fargo foreclosed on the apartment complexes serving as collateral for the Loan.

---

August 16, 2007.

[2] The Note, deeds of trust, Guaranty, and other documents comprising the Lee Hall, L.L.C., transaction will be referred to collectively as the "Lee Hall Loan" or "the Loan."

[3] A REMIC trust is a real estate mortgage investment conduit defined in § 860D of the Internal Revenue Code of 1986. 26 U.S.C. § 860D (2000). A mortgage qualifies as a REMIC mortgage if, at the time it was originated or contributed to the trust, it was principally secured by an interest in real property. Id. REMIC trusts are pools of mortgages in which the beneficial ownership has been sold to various investors in the form of certificates representing their undivided interest in the total mortgage pool. See, e.g., "Which loans qualify for REMIC trusts?," Commercial Lending Litigation News (October 14, 2004). If the REMIC trust complies with Internal Revenue Service regulations, mortgage payments made to the trust may be passed through to certificate holders free of federal taxes. See Dean Weiner and K. Peter Ritter, "Real Estate Mortgage Investment Conduits and Financial Asset Securitization Investment Trusts,"

Wells Fargo then filed a motion for judgment against Nizan and Cimerring in the Circuit Court of the City of Petersburg to recover the deficiency on the Note pursuant to the Guaranty. In a June 26, 2002 order, the circuit court granted partial summary judgment to Wells Fargo, ruling that "the Note at issue in this litigation is in default and that the Debt and other obligations under the Note, Deeds of Trust, Guaranty and other Loan Documents are fully recourse under the terms thereof."

Shortly before the trial date, Nizan filed for bankruptcy, and further proceedings against him were stayed until the bankruptcy court lifted the stay in February 2005.[4]

A.  The UBS Litigation and Settlement

In March 2002, Wells Fargo[5] filed a lawsuit against UBS in a Texas state court alleging breach of contract and fraud claims arising from UBS' transfer of numerous promissory notes in the securitized loan pool, including the Lee Hall Loan, to the REMIC

---

Commercial Securitization for Real Estate Lawyers, Volume 1, ALI-ABA COURSE OF STUDY MATERIALS (April 2003).

[4] Wells Fargo's claim against Cimerring proceeded to trial in the circuit court as scheduled. The circuit court entered judgment on February 18, 2003 in favor of Wells Fargo and against Cimerring for $6,619,005.86 in compensatory damages, with interest accruing at 13.2 percent from September 23, 2002.

In September 2005, Cimerring filed a bill of complaint to obtain relief from the judgment against him. The circuit court sustained Wells Fargo's demurrer to Cimerring's bill of complaint, and he appealed that judgment to this Court. We have affirmed that judgment by an order issued this day.

Trust.  Wells Fargo contended that UBS' conduct "materially and adversely affected the value of" the Lee Hall Loan, and it sought in the lawsuit to have UBS "honor its written, contractual obligation to repurchase" the Lee Hall Loan, "or pay damages equal to the repurchase price[]."[6]

In September 2004, UBS and Wells Fargo signed a settlement agreement and mutual release ("UBS Settlement"), which resolved the Texas litigation.  While the terms of the UBS Settlement were confidential, public documents introduced by Nizan in the circuit court indicate UBS paid $19.375 million to the REMIC Trust in "liquidation proceeds."[7]  Pursuant to the Pool and Servicing Agreement between Wells Fargo and Orix, the UBS Settlement proceeds were required to be classified as payment upon one or more of the promissory notes held in the REMIC Trust.  Consequently, Wells Fargo "treated [approximately $13.4 million from the UBS Settlement] as having been received in

---

[5] ORIX Capital Markets, LLC, ("Orix") brought the suit as "Master Servicer and Special Servicer of the Trust" on behalf of the REMIC Trust and Wells Fargo, as trustee.

[6] According to the Mortgage Loan Purchase Agreement ("MLPA") signed by Wells Fargo and UBS, the "Repurchase Price" was "an amount equal to the sum of" "the outstanding principal balance of [the loan] as of the date of purchase," "all accrued and unpaid interest," and related expenses.

[7] The Wells Fargo and ORIX Pool and Servicing Agreement defined "Liquidation Proceeds" as, inter alia, "[a]ll cash amounts . . . received . . . in connection with . . . the realization upon any deficiency judgment obtained against a Mortgagor."

4

respect of" the Lee Hall Loan for purposes of accounting in the REMIC Trust.

### B. Post-Bankruptcy Proceedings Against Nizan

After the bankruptcy court lifted the stay in February 2005, proceedings in the circuit court under Wells Fargo's motion for judgment recommenced.[8] Nizan sought additional discovery from Wells Fargo in the circuit court regarding the UBS Settlement. He maintained that Wells Fargo was barred from obtaining a "double recovery" from both him and UBS for the same damages represented by payments on the Lee Hall Loan. Nizan contended further discovery was necessary to determine whether, or to what extent, Wells Fargo had already received payment in the UBS Settlement for the same damages that Wells Fargo sought to recover from him under the Guaranty for the Lee Hall Loan.

In response, Wells Fargo filed a motion for a protective order and made an oral motion in limine so as to bar further discovery. Wells Fargo contended that the date for concluding discovery had passed prior to Nizan's bankruptcy and that the details of the UBS Settlement were irrelevant to its claims against Nizan. Wells Fargo asked the circuit court to adopt the

---

[8] Nizan stipulated that the "balance due and owing under the [Lee Hall Loan was] $6,619,005.86 as of September 23, 2002," plus interest accruing from that date at a rate of 13.2 percent per year until such sums were paid in full. Nizan's stipulation reserved his right to assert "that credits are due, or other claims or defenses which he may have to payment."

rationale articulated in an order entered by the United States Bankruptcy Court for the Southern District of Texas, <u>In re: Cyrus II Partnership</u>, No. 05-39857 (Bankr. S.D. Tex. 2005) ("<u>Cyrus</u>").

In <u>Cyrus</u>, the bankruptcy court held the UBS Settlement was irrelevant to resolving Wells Fargo's claims against another guarantor for another loan that was part of the same securitized mortgage loan pool as the Lee Hall Loan. While Nizan was not a party in <u>Cyrus</u>, Wells Fargo contended the issue was the same and involved a similarly-situated guarantor on a similar loan that was part of the same loan package UBS sold to the REMIC Trust that included the Lee Hall Loan. Wells Fargo argued the bankruptcy court's analysis was precisely on point and resolved any claim presented by Nizan as to the Lee Hall Loan by virtue of the UBS Settlement. Wells Fargo cited the following portion of the <u>Cyrus</u> opinion:

> When the Debtors signed the loan documents, they became obligated to the holders of the debt. [UBS] was never a maker of the note. UBS allegedly breached an independent obligation that it had to Orix. When it settled its breach by the payment of $19.4 million, UBS could have negotiated that it would have paid more to Orix for the transfer of the note to UBS. Or, UBS could have paid less and left the note with Orix. [UBS's] breach was independent of the Debtors' payment obligation. If UBS had acquired the note as part of its settlement (i.e., UBS had paid $19.4 million and received the note from Orix), the Debtors would have no conceivable argument that the Debtors would be entitled to a credit for UBS's payment. The transaction that occurred was wholly independent of

6

> the Debtors' obligation to pay on the note.  Because [UBS] paid less and left the note with Orix, the Debtors allege that they are entitled to a credit. Logic dictates that the amount owed by the Debtors should not be affected by the structure of a settlement between third parties.

Cyrus, slip op. at 3.

After a hearing, the circuit court granted the protective order and barred further discovery by Nizan as to the UBS Settlement by an order entered April 14, 2006 ("the Protective Order").  At the time of the ruling, the circuit court stated that additional discovery was not necessary for the parties to adequately argue their positions regarding the relevance of the UBS Settlement, and Nizan's defense of double recovery.

During a later pre-trial conference, the circuit court indicated that it had reviewed Cyrus more thoroughly and was persuaded by its reasoning.  However, the court permitted the parties to submit an additional brief limited to "why the reasoning and the bankruptcy case of [Cyrus] does not apply here and if it can be distinguished how the Virginia law would change that rationale."  The parties submitted further briefs and at a hearing on that limited issue, the circuit court reiterated its belief that Cyrus was persuasive, and concluded: "This suit by Wells Fargo against UBS was because of their misrepresentation of the value of those loans.  That's a separate issue [than

7

Nizan's liability as a guarantor.]  UBS or the guarantors did not have any common liability to Wells Fargo."

Consistent with this ruling, the circuit court entered an amended final order ("the Amended Final Order") on May 3, 2006, which stated:

> The UBS settlement and the manner in which the proceeds of such settlement were allocated are not relevant to Nizan's obligation as Guarantor to repay the entire amount due on the Lee Hall Loan, and Wells Fargo's recovery under the Guaranty does not constitute or operate as a double recovery.

Finding no further issues remaining in the case, the circuit court entered judgment in favor of Wells Fargo, and held Nizan liable "in the amount of $6,619,005.86 as of September 23, 2002" in addition to interest at a rate of 13.2 percent per year.  We awarded Nizan this appeal.

## II.  ANALYSIS

Nizan raises five assignments of error: (1) the circuit court erred "in determining, as a matter of law, that Wells Fargo was entitled to more than one recovery of the amounts due under the Note because Mr. Nizan and UBS did not have joint or common liability to Wells Fargo"; (2) the circuit court "erred in disregarding uncontroverted facts establishing that UBS compensated Wells Fargo in full for the damage claims asserted against Mr. Nizan"; (3) the circuit court "erred in denying Mr. Nizan the opportunity to conduct discovery on his defense of

8

double-recovery"; (4) the circuit court "erred in determining, as a matter of law, that the defense of double-recovery was not available to Mr. Nizan"; and, (5) the circuit court "erred in adopting as a basis for its ruling, without evidentiary support, the arguments advanced in Wells Fargo's various pleadings and briefs."

### A. Double Recovery Defense in a Uniform Commercial Code Proceeding

Before analyzing Nizan's assignments of error, we first address Wells Fargo's argument that under the Uniform Commercial Code ("UCC"), as applicable in Virginia, Nizan can only be relieved of his obligation to pay the Note if he is discharged from that obligation under the provisions of Code § 8.3A-601. That statute provides that discharge occurs "as stated in this title or by an act or agreement with the party which would discharge an obligation to pay money under a simple contract." Wells Fargo asserts that Nizan's liability was not discharged by any means described in Title 8.3A, nor by agreement with Wells Fargo. It further asserts that its "act" of "characterizing . . . the UBS Settlement [as a] write-off [of] the Lee Hall Loan . . . does not operate as a discharge." Therefore, Wells Fargo contends Nizan remains obligated to pay the Note and cannot assert an "extra-statutory 'equitable discharge'" means of relief via the defense of double recovery.

9

Whether an equitable defense such as double recovery can be asserted against the holder of a negotiable instrument under the UCC is an issue of first impression in Virginia. Code § 8.3A-601, on which Wells Fargo relies, addresses the means by which an obligation to pay a promissory note can be discharged under the UCC. However, Nizan does not assert that his obligation has been discharged. Instead, he has raised the defense of double recovery.

We have analyzed the common law defense of "double recovery" in several contexts, including as a defense to recovery of damages in contract-based actions. See, e.g., Cox v. Geary, 271 Va. 141, 150, 624 S.E.2d 16, 21 (2006); Klaiber v. Freemason Assocs., 266 Va. 478, 488-89, 587 S.E.2d 555, 560-61 (2003). This Court has recognized that a party with two valid causes of action is entitled to "seek compensation in each, [but is], nonetheless, estopped from collecting the full amount [of damages] in the second action if they were partially paid therefor in the first." Katzenberger v. Bryan, 206 Va. 78, 85, 141 S.E.2d 671, 676 (1965). We based this "proposition[] upon basic principles of fairness and justice." Id. We have also recognized that the holder of a promissory note may not "obtain a judgment against the [obligor] for the balance due on the note [when doing so] would be inequitable and allow him a double

recovery." Joyner v. Graybeal, 204 Va. 543, 546, 132 S.E.2d 467, 469 (1963) (pre-UCC).

The defense of double recovery is thus rooted in common law and equitable principles regarding the relief a particular party is entitled to receive, and is not based in either general contract law or the UCC. Specifically incorporated into the UCC by statute is the general principle that:

> [u]nless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause supplement its provisions.

Code § 8.1A-103. Thus, unless a particular provision of the UCC displaces the defense of double recovery, that defense would be available in a UCC-based claim. Code § 8.3A-601 does not touch upon, much less displace, the defense of double recovery.

Therefore, under the provisions of Code § 8.1A-103, the defense of double recovery may be applicable in UCC-based actions as "a principle of law and equity" not displaced. For purposes of this opinion, it is unnecessary to address the corollary issue of whether a person who successfully asserts the defense of double recovery is thereby "discharged" from the underlying debt under Code § 8.3A-601.[9] Accordingly, Wells

---

[9] Neither party raised any potential applicability of Code § 8.3A-305, "defenses and claims in recoupment," in the circuit

11

Fargo's argument under Code § 8.3A-601 fails. We now turn to the merits of Nizan's assignments of error.

B. Availability of Double Recovery Defense to Nizan

Nizan asserts in its second and fourth assignments of error that the circuit court erred in holding that Wells Fargo's recovery in the UBS Settlement did not compensate Wells Fargo, in some part, for the damages it sought from Nizan so that Nizan did not have a valid defense of double recovery. Nizan argues that he proffered sufficient evidence to "suggest that the [UBS Settlement] compensated Wells Fargo in full for its losses under the Lee Hall Loan." This is so, he maintains, because "Wells Fargo's damages in both [the case at bar] and in the UBS Litigation were based upon Wells Fargo's losses" as the holder of the unpaid Note. Nizan contends that the facts he asserted, "if proved at trial, would provide at least a prima facie case that Wells Fargo's claim against Mr. Nizan should have been reduced, at least in part, by the $19.375 million which Wells Fargo received from UBS."

Wells Fargo responds that the circuit court did not err because the prohibition of double recovery only applies when "recovery is sought for the 'very same items of damage,'" which did not occur in the case at bar. It asserts that the "'item of

court or in argument to this Court and we express no opinion thereon.

12

damage' for which Nizan is liable to Wells Fargo is payment of the amount due on a negotiable instrument," while the " 'item of damage' for which UBS was liable was the amount the Trust overpaid in its purchase of the pool of loans – that is, an adjustment in the purchase price." Wells Fargo submits that the circuit court "properly recognized the distinction between the injuries [Wells Fargo] sustained as a result of UBS's action and those sustained by Nizan's failure to pay his obligations." It contends that UBS could have repurchased the Note as part of the Settlement Agreement, but did not do so; instead, Wells Fargo "remain[ed] the holder entitled to enforce" the obligation to pay the balance due on the Note. Lastly, Wells Fargo asserts that under Lanasa v. Willey, 251 Va. 231, 234 n.4, 467 S.E.2d 786, 788 n.4 (1996), a person who is obligated to pay a promissory note must do so "according to its terms" and cannot assert a defense of double recovery to prevent the holder from enforcing the terms of the note. Id.

Initially, we note that Wells Fargo's reliance on Lanasa is misplaced. In that case, two individuals signed a promissory note, and the holder of the note sought to enforce the note against Willey, one of the makers. Willey argued that the holder should be limited to collecting one-half of the note balance because the holder could collect the remainder due under the note from the other maker. Willey contended that permitting

13

the holder "to recover the full amount of the [n]ote would facilitate a double recovery." Lanasa, 251 Va. at 234 n.4, 467 S.E.2d at 788 n.4. This Court rejected that argument, stating, "Willey's sole obligation in this matter is as a maker of the note. She and the other maker[] are 'jointly and severally liable in the capacity in which they sign,' and, if she pays the note, she will be entitled to receive contribution from the other maker[]." Id. Clearly, what Willey argued in Lanasa was not the same "double recovery" defense that Nizan makes here. While Willey sought to have her joint and severable obligation reduced based on the co-liability of other obligors under the promissory note, Nizan seeks to have his obligation reduced based on Wells Fargo's alleged recovery for the same damages it now seeks to recover against him.

Among the factual representations Nizan made to the circuit court in support of the defense of double recovery were: (1) Wells Fargo sued UBS seeking "repurchase" of, inter alia, the Lee Hall note; (2) Wells Fargo's expert witness in the UBS litigation used the "repurchase price," rather than "investor damages" as the basis for calculating damages relative to the Lee Hall Loan; (3) Wells Fargo represented to the courts in Cyrus and Trust for Certificate Holders of Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp., 2007 U.S. Dist. LEXIS 13566, No. 04 Civ. 9890 (SAS) (S.D.N.Y. Feb. 27, 2007),

14

that guarantors of other loans that were part of the UBS Settlement were not entitled to "credit" from the UBS Settlement proceeds because those proceeds were allocated to the Lee Hall Loan; and (4) Wells Fargo allocated some of the proceeds from the UBS Settlement to the Lee Hall Note for REMIC Trust purposes, and notified certificate holders of the REMIC Trust that the Lee Hall Loan had a zero balance following this allocation.

We begin by distinguishing Nizan's third and fourth representations from the first two. At trial and on appeal, Nizan contended that Wells Fargo's allocation (or the allocation by ORIX on behalf of Wells Fargo) of the UBS Settlement for purposes of the REMIC Trust to the Lee Hall Loan was persuasive, albeit not dispositive, evidence supporting his defense that Wells Fargo had been reimbursed for its damages arising from the Lee Hall Loan. We do not agree that Wells Fargo's accounting allocation of the UBS Settlement proceeds to the Lee Hall Loan is relevant to Nizan's defense of double recovery. Under the REMIC Trust's operating documents and in accordance with federal tax law governing those trusts, Wells Fargo was required to allocate the proceeds of the UBS Settlement as payment upon one or more of the Trust's assets. How Wells Fargo chose to allocate this money within the REMIC Trust does not have any legal effect on Nizan's liability on the Note nor does it show

15

the allocated funds were in fact paid by UBS as the same damages Wells Fargo seeks to recover against Nizan. See, e.g., Long v. Turner, 134 F.3d 312, 316-17 (5th Cir. 1998) ("a write-off of a debt on the creditor's book is an accounting practice that does not of itself amount to a discharge or release of the debt. . . . A write-off is merely an accounting practice or convention for reducing to zero the value of an asset as shown on a balance sheet."). That Wells Fargo may have made representations in other courts about the allocations for REMIC Trust accounting purposes is likewise irrelevant to a double recovery claim.[10]

By contrast, we find that Nizan's first and second factual representations noted above were relevant to determining whether Wells Fargo had recovered damages under the Lee Hall Loan of the same character as that sought from Nizan. The first and second representations, if proven at trial, could be sufficient to make a prima facie case of double recovery. We reach this conclusion upon review of the principles set out in Katzenberger and Cox.

In Cox, we summarized Katzenberger's factual background:

> [T]he purchasers of real property filed a motion for judgment against an attorney who had examined and certified title to the parcel of property they had contracted to purchase. At the time the suit was filed, the purchasers had already settled a claim

---

[10] Whether Wells Fargo's representations in other courts implicate some form of estoppel is not an issue before us and we express no opinion in that regard.

against the sellers of the property for breach of the warranty of title.

. . . .

The purchasers were wronged by the sellers because the sellers "breached their covenant that they had the right to convey the land," and the purchasers were separately wronged by the attorney because he "breached his duty to use due care in examining the title to the property."

Cox, 271 Va. at 149-50, 624 S.E.2d at 20-21 (internal citations omitted).  Nonetheless, in Katzenberger we held:

While the [purchasers], by settling their contract action against the [sellers] were not barred from seeking further recovery in their tort action against the [attorney], they were not entitled to secure a double recovery.  While they had two separate causes of action and were entitled to seek compensation in each, they were, nonetheless, estopped from collecting the full amount in the second action if they were partially paid therefor in the first case.  These propositions are applicable to this case . . . upon basic principles of fairness and justice.
As has been noted, it may be assumed that the [sellers] did not pay for an element of damage for which they were not liable. . . .
But the [purchasers] alleged substantially the same elements of damages in their action against the [sellers] and in their action against the [attorney].

. . . .

It thus appears that, in the satisfaction made by the [sellers] and in the verdict rendered against the [attorney], there may have been a duplication in [one element of damages claimed in each case].  [I]f it was shown that a portion of the settlement was applicable to the very same items of damages which the [purchasers] sought against the [attorney], the [purchasers'] recovery could have been reduced by the extent of the duplication.

17

206 Va. at 85-86, 141 S.E.2d at 676-77.  Because all evidence relating to the settlement was excluded, we reversed the judgment of the circuit court and remanded the cause for a new trial.  Id. at 86-87, 141 S.E.2d at 677.

In Cox, the plaintiff filed a motion for judgment against his former attorneys for malpractice, and sought damages arising from his wrongful conviction and imprisonment.  271 Va. at 146-47, 624 S.E.2d at 19.  Prior to filing suit, the plaintiff had received "compensation from the Commonwealth [for] his wrongful incarceration."  Id. at 145, 624 S.E.2d at 18.  The plaintiff did "not argue that the type of injuries for which the General Assembly compensated him differ[ed] from the type of injuries he" alleged against his former attorneys.  Id. at 148, 624 S.E.2d at 20.  We held that the plaintiff did "not seek to recover from the Attorneys an element of damage different from the damages provided by" the General Assembly's action.  The injuries and damages were the same and the plaintiff was only entitled to one recovery for those injuries and damages.  Id. at 151, 154, 624 S.E.2d at 22-23.

Nizan's first and second factual representations thus raise the potential connection of damages Wells Fargo sought and recovered from UBS to the damages Wells Fargo now seeks against Nizan.  It would be a question of fact, or mixed question of law and fact, at a trial on the merits as to whether the UBS payment

18

in the UBS Settlement was a payment on the Note or some other type of damages such as the "investor damages" Wells Fargo recites.  Based on our jurisprudence regarding the defense of double recovery, if some of the proceeds from the UBS Settlement were indeed a payment or partial payment by UBS of the Note, then a valid argument would be set forth that the damages recovered from UBS and sought from Nizan are the same damages: payment of the Note.  If Nizan proves the factual representations at trial, he may have presented a prima facie claim of double recovery.

The circuit court thus erred in ruling as a matter of law, at this stage of the proceedings, that the damages recovered as part of the UBS Settlement could not be the same damages Wells Fargo seeks against Nizan.  The circuit court also erred, at this stage of the proceedings, in preventing Nizan from presenting further evidence as to whether Wells Fargo could recover damages from Nizan if the proceeds from the UBS Settlement compensated Wells Fargo for the same damages under the Lee Hall Loan.

### C.  Joint or Common Liability

Nizan also contends the circuit court erred by determining "Wells Fargo was entitled to more than one recovery of the amounts due under the Note because Mr. Nizan and UBS did not have joint or common liability to Wells Fargo."  Neither the

19

Amended Final Order nor the Protective Order recite that holding; however, the Protective Order recites as a basis for the order "the reasons set forth from the bench on . . . February 22, 2006." The Amended Final Order references the language of the Protective Order.

At a hearing on February 22, 2006, during which the circuit court concluded that Nizan was precluded, as a matter of law, from arguing the defense of double recovery, the court stated from the bench, "I have been particularly persuaded by the [Cyrus] case from the bankruptcy court. . . . It appears the rationale set forth there would seem to indicate there's no right to share in how they distribute the money. They still owe the debt." The court then stated "my conclusion is that this case really sets forth the principal [sic] in the [Cyrus] case and the reason that should be and will be applied to this case."

At its subsequent hearing in which the parties argued Nizan's amended motion for reconsideration and the language to be included in a final order, the circuit court affirmed that its ruling was based, in part, on a lack of "common liability" between Nizan and UBS and the rationale of Cyrus. The circuit court stated the following:

> I indicated that I thought Cyrus was persuaded [sic], and I think still think it's persuaded [sic], although not controlling.

20

In their terminology of solidary liability in my reading of it, while it's not inconsistent with Virginia law – in fact, the bankruptcy court referred to it as a common law version of joint liability, and that's in its language.

Nizan was not a party to this settlement, it was not made on his behalf, and there is no common liability. You've argued that common liability does not apply, but there is no common liability.

This suit by Wells Fargo against UBS was because of their misrepresentation of the value of those loans. That's a separate issue.

And I agree with Wells Fargo's analysis as to Katzenberger's applicability, and [Cox]. I do not find that they really deal with the specifics of this case or the underlying laws as it relates to this case. UBS or the guarantors did not have any common liability to Wells Fargo.

And for all the reasons stated in plaintiff's brief and for the reasons I've so stated, I do grant the motion in limine, and I will enter judgment for the plaintiff.

To the extent the circuit court based its judgment that Nizan could not assert a claim of double recovery against Wells Fargo because Nizan had no "common liability" with UBS as to the Note, the circuit court erred. Our jurisprudence is clear that the defense of double recovery arises from a claim as to the same damages, not the same basis of liability for the damages. We return to our analysis in Katzenberger to amplify this point.

As noted above, the Katzenbergers bought real property that did not have the access as represented by the sellers. Their closing attorney failed to detect this defect in his title

21

examination.  The Katzenbergers brought successive suits against

the sellers for breach of warranty of title and against the

attorney for malpractice for a defective title examination.  In

both actions, the Katzenbergers asserted as damages the

diminution in value of the property because of the defects in

title.  The Katzenbergers entered into a settlement agreement

with the sellers of the property but continued their action

against the attorney seeking a full recovery.  We recognized

that

> [the sellers] and the [attorney] were not joint tort-
> feasors, they were not in privity one with the other
> and they were not acting in concert in any manner.
> Their acts which gave rise to the claims against them
> were separate, different and distinct.  If the
> [purchasers] were wronged, it was because the
> [sellers] separately breached their covenant that they
> had the right to convey the land and because the
> [attorney] separately breached his duty to use due
> care in examining the title to the property.  The
> [sellers] were strangers to the wrong allegedly
> committed by the [attorney] and he a stranger to the
> wrong allegedly committed by them.

Katzenberger, 206 Va. at 85, 141 S.E.2d at 676.  The

Katzenbergers thus had separate and distinct causes of action

against the sellers and the attorney based on each defendant's

conduct, but for the same injury.  We concluded that

> [w]hile the plaintiffs, by settling their contract
> action against the [sellers] were not barred from
> seeking further recovery in their tort action against
> the [attorney], they were not entitled to secure a
> double recovery.  While they had two separate causes
> of action and were entitled to seek compensation in
> each, they were, nonetheless, estopped from collecting

22

> the full amount in the second action if they were
> partially paid therefor in the first.

Id. (emphasis added).

Katzenberger establishes that what is dispositive to a defense of double recovery is whether the damages claimed, on whatever theory of liability, are the same damages. If the element of damages is the same, it makes no difference that the potential payors are not joint tortfeasors or jointly and severally liable under the same theory of liability.

The circuit court's reliance on Cyrus is thus inapposite. In Cyrus, the bankruptcy court applied Louisiana law which "encompasses the concept of 'solidary liability'. 'An obligation is solidary for the obligees when it gives each obligee the right to demand the whole performance from a common obligor. When obligations are independent, Louisiana law does not allow the settlement of one independent obligation to affect liability on the other." Cyrus, slip op. at 3 (citation omitted). Consequently, the bankruptcy court concluded that "there is no solidary liability here because UBS . . . and the Debtors did not have a common liability . . . under Louisiana law." Id., slip op. at 4.

This concept of solidary liability under Louisiana law has no nexus to a claim of double recovery in Virginia and is not an element of that defense. To the extent the circuit court based

23

its judgment on the view that common liability was a required element of a double recovery defense, that ruling was in error. In order to assert the defense of double recovery against Wells Fargo, Nizan must prove that the damages Wells Fargo received from UBS and what it seeks from Nizan are the same, not that Nizan and UBS are jointly liable under a common basis of liability or through the same cause of action.

## D. Discovery

Nizan also assigns error to the circuit court's ruling that denied him the "opportunity to conduct discovery on his defense of double-recovery." Nizan contends the circuit court's "denial of discovery restricted [him] to matters of public record to support his defense," and "had the effect of granting summary judgment since it was predicated upon the assumption that there was no set of facts which [Nizan] could prove that would support his defense of double-recovery."

Wells Fargo responds that "[d]iscovery on the UBS Settlement would be a fruitless exercise" because Nizan acknowledged that the "principal facts" regarding the UBS Settlement were not in dispute. "Thus," Wells Fargo asserts, "the [circuit] court possessed all the facts necessary for making the ruling with respect to the relevance and admissibility of the evidence relating to the UBS [S]ettlement." Because "Nizan was afforded numerous opportunities to explain to

the [c]ircuit [c]ourt the relevance of the UBS" settlement, Wells Fargo argues that the circuit court properly denied additional discovery because it would have been "a waste of time and would not alter the final result."[11]

Rule 4:1(b)(1) states that with certain exceptions "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party."  The court can limit "the frequency or extent of" discovery methods

> if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative . . .; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

Id.  "Generally, the granting or denying of discovery is a matter within the discretion of the [circuit] court and will not be reversed on appeal unless 'the action taken was improvident and affected substantial rights.' "  O'Brian v. Langley Sch.,

---

[11] One of Wells Fargo's original arguments opposing further discovery was that the parties' discovery deadline passed before Nizan requested additional discovery into the UBS Settlement. However, this is not a relevant consideration since the UBS Settlement, and therefore knowledge of its potential relevance

256 Va. 547, 552, 507 S.E.2d 363, 366 (1998) (quoting Rakes v. Fulcher, 210 Va. 542, 546, 172 S.E.2d 751, 755 (1970)).  In O'Brian, we held the circuit court erred by entering summary judgment for the plaintiffs before permitting the defendants to conduct discovery on their defense that a contract's liquidated damages provision was unenforceable.  Id. at 549, 507 S.E.2d at 364.  The Court then noted that although the parties signed a contract that contained a liquidated damages provision, a recognized defense to the enforceability of such a provision exists under certain circumstances.  Id. at 550-51, 507 S.E.2d at 365.  Because the circuit court in O'Brian "precluded any inquiry into the validity of the liquidated damages clause by denying the O'Brians' motion to compel and subsequently awarding summary judgment before hearing any relevant evidence on the issue" we reversed the court's judgment.  Id. at 552, 507 S.E.2d at 366.  We concluded that "the [circuit] court's actions . . . substantially affected the [defendants'] ability and right to litigate the validity of the liquidated damages clause" and the court abused its discretion in denying discovery.  Id. at 552, 507 S.E.2d at 366.

Similarly, in the case at bar, Nizan sought to assert a defense of double recovery, which is legally cognizable in

_____

to the case at bar, occurred after the prior discovery deadline had passed.

Virginia. The circuit court prevented Nizan from conducting discovery that could be relevant to producing evidence of double recovery as to whether some part of the UBS Settlement proceeds represent payment on the Note and are the same damages Wells Fargo seeks to recover from Nizan. By preventing Nizan from conducting further discovery, the circuit court substantially affected Nizan's "ability and right to litigate" his defense. Accordingly, the circuit court abused its discretion in denying Nizan the opportunity to conduct additional discovery into the UBS Settlement.[12]

## III. CONCLUSION

For the aforementioned reasons, the circuit court erred in denying Nizan the opportunity to conduct discovery related to his defense of double recovery, in concluding that the UBS Settlement could not, as a matter of law, constitute a double recovery for the damages Wells Fargo sought from Nizan, and in adopting the rationale that the defense of double recovery required a common liability instead of common damages. Accordingly, we will reverse the judgment of the circuit court

---

[12] Nothing in our opinion restricts the circuit court's oversight into the scope, means, and method of discovery into the UBS Settlement. Upon remand, the circuit court can hear the parties' arguments on this issue and provide reasonable protection for confidentiality, including in camera review, if the need be shown.

and remand the case for further proceedings consistent with the views expressed in this opinion.[13]

_Reversed and remanded._

---

[13] In view of our resolution of the other assignments of error, we do not address Nizan's fifth assignment regarding the language in the Protective Order, which "adopt[ed] in their entirety" the "reasons set forth in [Wells Fargo's] Motion for Protective Order, Reply in Support of Motion for Protective Order and Brief in Support of Court's Ruling."

To the extent that the circuit court's judgment in favor of Wells Fargo relied on any of Wells Fargo's additional trial argument opposing the applicability of the double recovery defense, none merit discussion or stand as an independent basis to sustain the circuit court's judgment at this stage of the proceedings.